IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| MARK M. ROSE, ) | |
| ) | CASE NO. BK05-83572-TJM |
| Debtor(s). ) | A05-8088-TJM |
| BANK OF NEBRASKA, ) | |
| ) | |
| Plaintiff, ) | CHAPTER 7 |
| ) | |
| vs. ) | |
| ) | |
| MARK M. ROSE, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| MARK M. ROSE and THOMAS D. ) | |
| STALNAKER, Chapter 7 Trustee, ) | |
| ) | |
| Counter-Claimants, ) | |
| ) | |
| vs. ) | |
| ) | |
| BANK OF NEBRASKA, ) | |
| ) | |
| Counter-Defendant. ) | |

ORDER

This matter is before the court on the Bank of Nebraska's complaint to determine dischargeability of a debt. Trial was held in Omaha, Nebraska, on March 6, 7, and 8, 2012. Joel Carney and Craig Knickrehm appeared for Bank of Nebraska, Barbara Lohr Van Sant appeared for the debtor, and John Stalnaker appeared for the Chapter 7 trustee.

The debtor borrowed money from the Bank of Nebraska in 2003, 2004 and 2005, and defaulted on a loan. The bank sold the collateral pledged by the debtor, but a deficiency balance of more than $300,000.00, plus interest, exists. The bank filed this adversary proceeding to except that debt from discharge under 11 U.S.C. § 523(a)(2)(B), alleging the debtor made materially false written statements regarding his financial condition upon which the bank, to its detriment, relied. The debtor counterclaimed against the bank, alleging breach of the bank's duty under the Uniform Commercial Code to specifically identify its collateral, as well as its duties to deal in good faith with the debtor, to use reasonable care in the custody and preservation of the debtor's collateral in its possession, and to conduct a commercially reasonable sale of the collateral. The debtor also alleges that the bank converted or allowed the conversion of some of the collateral in its possession. The trustee of the debtor's Chapter 7 bankruptcy estate was eventually joined as a party to the proceedings.

The following facts are uncontroverted:

1. Mark M. Rose, the debtor-defendant herein, filed a voluntary petition commencing this Chapter 7 case on September 11, 2005.

2. Bank of Nebraska filed this adversary proceeding on December 10, 2005.

3. Mr. Rose filed his amended answer and counterclaims on May 16, 2008.

4. The bank filed its answer to the counterclaims on June 19, 2008.

5. At all times relevant herein, Bank of Nebraska was a bank duly organized and existing under and pursuant to the laws of the State of Nebraska with its principal office and place of business located in Papillion, Sarpy County, Nebraska.

6. Mr. Rose was at all times relevant herein an individual operating an unincorporated business called Great View Window Company in Sarpy County, Nebraska.

7. Great View Window Company operated in two successive locations: 1124 Applewood Drive, Papillion, Nebraska, and 13232 Portal Drive, Suite 8, La Vista, Nebraska.

8. The bank made a loan to Mr. Rose on February 28, 2005. Mr. Rose executed and delivered to the bank the promissory note number 7000988. Said promissory note was one of a series of notes between Mr. Rose and the bank; those prior notes were numbered 7003264, 7000762 and 7003265.

9. The bank took possession of coins belonging to Mr. Rose in five safe deposit boxes, three of which were of the dimensions of 10 x 10 x 25 inches, and two of which were of the dimensions of 5 x 10 x 10 inches.

10. Bank vice-president Kevin Dasher kept all the keys to those safe deposit boxes after October 2004.

11. Mr. Dasher entered the boxes after October 2004, prior to any default by Mr. Rose.

12. Mr. Dasher retained the lists of coins provided to him by Mr. Rose.

13. Mr. Rose surrendered the keys to bank vice-president Richard Copple in May 2005.

14. The bank sold Mr. Rose's coins at private sale.

15. The bank sold Mr. Rose's business inventory and equipment at private sale.

To except a debt from discharge under 11 U.S.C. § 523(a)(2)(B), a creditor must prove, by a preponderance of the evidence, that the debtor obtained money by (1) use of a statement in writing that was materially false; (2) that pertained to his or his business's financial condition; (3) on which the plaintiff reasonably relied; and (4) that the debtor made with the intent to deceive

the plaintiff. Jacobus v. Binns (In re Binns), 328 B.R. 126, 129 (B.A.P. 8th Cir. 2005); Northland Nat'l Bank v. Lindsey (In re Lindsey), 443 B.R. 808, 813 (B.A.P. 8th Cir. 2011).

A financial statement is materially false if it "paints a substantially untruthful picture of a debtor's financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." Wallander v. Wallander (In re Wallander), 324 B.R. 746, 752 (Bankr. N.D. Iowa 2005) (quoting Burbank v. Capelli (In re Capelli), 261 B.R. 81, 90 (Bankr. D. Conn. 2001)); Capital City Bank & Trust v. Kroh (In re Kroh), 88 B.R. 987, 994 (Bankr. W.D. Mo. 1988) (stating that a financial statement is materially false if it, as a whole, falsely represents the debtor's overall financial condition or contains major omissions).

Reasonable reliance is determined by looking at the totality of the circumstances. First Nat'l Bank of Olathe v. Pontow (In re Pontow), 111 F.3d 604, 610 (8th Cir. 1997). The court may consider if there were any "red flags" that would have alerted the creditor to the possibility that the financial statement was not accurate and whether minimal investigation would have revealed the inaccuracy. Id. (citing Coston v. Bank of Malvern (In re Coston), 991 F.2d 257, 261 (5th Cir. 1993) (en banc)). When a financial statement is inaccurate on its face, and the creditor has knowledge of the inaccuracies, any reliance by the creditor on the financial statement is unreasonable. R & R Ready Mix, Inc. v. Freier (In re Freier), 402 B.R. 891, 899 (B.A.P. 8th Cir. 2009).

For discharge to be barred, the debtor must have acted with intent to deceive. An intent to deceive does not mean that the debtors acted with a "malignant heart." Agribank, FCB v. Webb (In re Webb), 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000)). A creditor may establish such intent by proving reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement. Fairfax State Sav. Bank v. McCleary (In re McCleary), 284 B.R. 876, 888 (Bankr. N.D. Iowa 2002). Factors to consider include whether the debtor was intelligent and experienced in financial matters, and whether there was a clear pattern of purposeful conduct. Id. (citations omitted). Once the creditor establishes that the debtor had actual knowledge of the false statement, the debtor cannot overcome the inference of the intent to deceive with unsupported assertions of honest intent. Heritage Bank of St. Joseph v. Bohr (In re Bohr), 271 B.R. 162, 169 (Bankr. W.D. Mo. 2001).

The parties began their lending relationship in June 2003. The debtor obtained a series of business loans and pledged all of his business assets, a vehicle, and, eventually, coins from his collection (held in safe deposit boxes at the bank) as collateral. The last loan the debtor received from the bank was a 10-day demand note in February 2005 for $393,080.04, secured by the business assets and the coins. The debtor defaulted on that note, so the bank called it and accelerated another outstanding loan secured by a vehicle and thereafter liquidated the collateral, leaving a deficiency of $385,106.49 plus interest as of August 3, 2005.

The bank argues that the debtor intentionally misrepresented the value of his assets in order to induce the bank to lend him money. The bank specifically questions the stated values of the business inventory, accounts receivable, and coins, because the bank experienced difficulty in collecting on any of the receivables, sold the inventory for $6,000.00, and sold the coin collection for $14,850.00.

The debtor takes the position that the bank's marketing efforts for the coins, the inventory, and the business itself were inadequate and, if done properly, would have yielded a much greater return.

At the trial, Kevin Dasher, the Bank of Nebraska loan officer responsible for the loans to Mr. Rose testified concerning the history of the banking relationship. In April of 2003, Mr. Rose asked Mr. Dasher if the Bank of Nebraska would be interested in taking over the financing for his business. He provided a personal financial statement (Fil. No. 249) which showed assets of $807,220.00 and liabilities of $533,720.00. Included as assets were accounts and notes receivable of $271,020.00 and a coin collection of $409,000.00. He told Mr. Dasher that he had had the coin collection appraised and the appraisal supported the valuation he placed on his financial statement. He promised to provide a copy of the appraisal to Mr. Dasher. However, on or about May 23, 2003, Mr. Dasher received a letter from Mr. Rose (Fil. No. 210) in which Mr. Rose stated that he was still looking for the appraisal but he had an appointment with a coin buyer to get an appraisal and that would be done in the next two weeks. The letter further stated that he would bring the coins in to be placed in safe deposit boxes at the bank and that, since the earlier appraisal was at least five years old, the new appraisal should be at least $450,000.00 to $475,000.00.

Mr. Rose did bring the coin collection to the bank and it was placed in five safe deposit boxes. Along with the coins, Mr. Rose brought a list itemizing by identification each coin and he and Mr. Dasher went over the list.

In addition to the coin collection identified on the initial financial statement of Mr. Rose, he also included a baseball card collection valued at $173,000.00 and a gun collection valued at $27,000.00.

Based upon the representations by Mr. Rose in the financial statement and his oral and written representations that he had an appraisal of the coin collection and would be obtaining a new one, the bank agreed to take over his financing and the first note (Fil. No. 170) was in the amount of $250,000.00. That loan was made on June 4, 2003, with a due date of June 4, 2004.

In addition to requesting a financial statement from Mr. Rose, Mr. Dasher asked for an aging report on accounts receivable and a balance sheet, tax returns and annual financial statements. Mr. Rose did not deliver the requested accounts receivable aging reports nor most of the other records requested.

In 2004, Mr. Rose provided the bank with a personal financial statement, including his business assets, as of February 10, 2004. On that document (Fil. No. 173), the coin collection was valued at $497,000.00, the baseball card collection at $173,000.00 and the gun collection at $27,000.00. His total assets were listed at $943,750.00 with total liabilities of $912,264.00.

The original loan in 2003 did not take as security the coin collection because the bank did not have possession of it at that time. However, when the 2004 loan was executed, the promissory note listed the coin collection as well as the business assets as collateral, and a "collateral receipt" dated 10/19/2004 (Fil. No. 176) and tied to a loan dated that date and due in October of 2005, did list the coin collection held in specifically identified safe deposit boxes at Bank of Nebraska.

Mr. Rose's personal financial statement as of February 2005 lists total assets of $1,512,000.00 and total liabilities of $1,045,333.00 (Fil. No. 188). Included as assets are accounts and notes receivable in the amount of $367,000.00 and other personal property in the amount of $974,000.00. That category includes the coin collection, the card collection and the gun collection. In addition, inventory was listed at $104,000.00.

Because Mr. Rose was unable to supply an appraisal for the coin collection or to provide business records which would support the listed accounts receivable and the inventory value, the bank decided to terminate its relationship and gave Mr. Rose a short period of time to refinance his debt to the bank. When he was unable to do so, the bank called the note due. Mr. Rose voluntarily turned over the keys to the rental property in which he operated his business. Mr. Dasher entered the premises and found no business records whatsoever but did find windows and doors which were the business inventory.

In order to liquidate the inventory, Mr. Dasher checked with a few companies that were in the same business and talked to one or more builders. A bank customer who designed and built custom homes and did remodeling of homes viewed the inventory and determined that it was not something that she was interested in purchasing because the inventory was of the type that would be difficult to use in the upscale custom homes her company built. In addition, she would be required to warehouse the inventory instead of simply ordering from a supplier when she needed doors or windows. However, she did agree to make an offer. She originally bid $2,500.00 for everything. After discussion with Mr. Dasher, she raised her bid to $6,000.00 and purchased it all. She testified that she still thinks she overpaid.

With regard to the accounts receivable, Mr. Dasher had received a list of names and addresses and amounts. He notified each of the account debtors that they should pay the bank, but none did. That may be because of the manner in which Mr. Rose created accounts receivable. He testified that when he bid a job, he treated the bid as an account receivable, apparently even if he did not actually get the job. On the other hand, on some of the jobs he did get, the customer paid in advance all or part of the price. Those pre-payments were not necessarily reflected as deductions from accounts receivable.

Concerning the liquidation of the coin collection, Mr. Dasher contacted three different entities – an individual and two retail coin sellers. They each reviewed the coins and Mr. Dasher received bids of $12,505.00, $13,000.00, and then, finally, a bid of $14,850.00. He accepted the $14,850.00 bid and, after deduction for certain expenses, applied the remaining balance of approximately $13,000.00 to the outstanding debt.

Mr. Rose testified that he never did have an appraisal of the coins and denied that he wrote to Mr. Dasher telling him he had such an appraisal. He denied his signature on a number of pieces of correspondence and claimed that Mr. Dasher must have fabricated the correspondence. In contrast to the testimony of Mr. Dasher, Mr. Rose claims that when he gave up the premises, he had business records, including invoices, in the desk drawer and a computer below the desk. He claims he made a copy of the business records and left the originals for the bank. He believed his inventory was significantly more valuable than the price the bank obtained. He believes the bank could have determined the value of the doors and windows simply by using the price books that he left in the office.

Concerning the coin collection, he testified that in 2003 the value was $500,000.00 and by 2005, the value was at least $900,000.00. However, he has no appraisal or any other valuation evidence other than his own opinion and that of his expert witness, who never did see the coins. He admitted on cross-examination that the value of the coin collection he placed on each of the annual financial statements was simply his best guess based upon his experience. That value increased each year.

Although he had listed the baseball card collection, which was not collateral of the bank, at $173,000.00, he admits he sold it for between $15,000.00 and $25,000.00. He sold the gun collection for less than the value that he had placed on the financial statements. With regard to several documents, Mr. Rose first denied that he prepared them and then, eventually, he admitted that he did prepare them.

Shortly after the collateral was liquidated, Mr. Rose filed a Chapter 13 bankruptcy. That case was eventually dismissed and he filed the underlying Chapter 7 bankruptcy. The bank filed an adversary proceeding in the fall of 2005 asserting that Mr. Rose had provided materially false financial information in order to obtain loans from the spring of 2003 through February 2005. Mr. Rose was represented by counsel at the time the adversary proceeding was filed. He admits that he had his business records at the time the adversary proceeding was filed, but that he destroyed them several months or years after the case was filed. Those records, had they been preserved, may have supported Mr. Rose's position that his company had significant contracts and accounts receivables and inventory valued, at cost or market, close to the value he placed on the February 2005 financial statement.

The issue raised by Mr. Rose concerning the value of the coin collection at the time it was liquidated by the bank was dealt with by the testimony of two individuals, one of whom, Mr. Schroeder, is a coin dealer and appraiser who had viewed and handled all of the coins and had bid $13,000.00 for the coins when the bank put them up for sale. He testified that, in order to value coins, especially for purchase, the appraiser needed to actually see the coins to determine their condition and type. Although he was not a successful purchaser when the bank sold the coins, he did eventually purchase most, if not all of the coins, from the original purchaser. Following the trial, the parties stipulated to the admission of his appraisal (Fil. No. 370). Working from a list of coins provided by the bank, and using his ordinary professional procedure and source material, he valued the collection at $29,000 to $35,000.

The person who testified on behalf of Mr. Rose, Mr. Anderson, is also a coin dealer and appraiser. However, he had not seen the coin collection, except for a few pieces that he had sold to Mr. Rose originally. He based his appraisal on a review of a list of the coins provided to him by Mr. Rose. The list was not complete in that on some entries the type of coin was not even mentioned. Mr. Anderson made his own assumptions as to what the coin or coins were that lacked description. In several cases he determined that the undescribed coin was actually a full set of five coins, called a proof set, and, without seeing such a proof set, he placed a value on it of approximately $30,000.00. So, without seeing any of the coins and without being able to determine their condition or their actual type in many cases, by using such a procedure, Mr. Anderson came up with a value range of $5,000,000.00 to $7,000,000.00 as of January 15, 2008.

Mr. Anderson testified that although he used 2007 and 2008 values for the coins, the value at the year 2005 could be determined by a calculation. For example, he claimed that coins

increase in value approximately 7% a year. In contrast, Mr. Schroeder testified that there is no standard for determining increases or decreases in value of coins year to year because the value depends upon the condition of the coins and the content, such as gold or silver. The value also depends upon the economy.

With regard to the issue of the documents submitted to the bank in support of Mr. Rose's loan requests, he denied that he had submitted certain of the documents. He denied his signature on numerous documents. To resolve this concern, the bank and Mr. Rose submitted written statements from persons they agreed could be considered handwriting experts. The expert employed by the bank determined that she was certain that most of the signatures were of Mr. Rose. She had some difficulty with a few of the signatures and was unable to determine one way or the other whether they were Mr. Rose's signatures.

The expert employed by Mr. Rose claimed that certain initials on the safe deposit box records were made by Mr. Dasher, not a person with the actual initials P.B. However, Mr. Dasher and the person whose initials are P.B. testified orally or by affidavit that P.B. is an employee of the bank who was responsible for keeping the records concerning entry to a safe deposit vault and that she placed her initials on those documents. The expert also suggested some of the documents were signed by Mr. Dasher, who denied ever signing a document as Mr. Rose.

Mr. Rose's expert also determined that at least one signature was not that of Mr. Rose, although Mr. Rose had admitted in trial testimony that it was his signature.

From the evidence presented, both by oral testimony and by submission of affidavits, the following facts are found:

1. Mr. Rose did submit to the bank all of the documents that contain what appears to be his signature.

2. The bank used commercially reasonable methods to liquidate the inventory, the accounts receivable and the coin collection.

3. The coin collection in the summer of 2005 was worth between what it sold for and a maximum of $35,000. Three qualified coin collectors viewed the coins and valued them. They bid against one another in a blind auction and the sale price of approximately $14,000.00 was the value of the coins at that time. Selling at that price was commercially reasonable.

4. The appraisal method used by Mr. Anderson is unsatisfactory. He basically used the "guess method" to determine, first, what an undescribed coin was, and then, without viewing the coin, but apparently basing some of his opinion on information he received from Mr. Rose, determined not only what the coin was or coins were, but their condition and from there he determined their value. He did not see any of the coins and did not know what condition they were in other than from the information he received from Mr. Rose. His opinion of value is given no weight.

5. Mr. Rose intentionally inflated the value of his assets on the annual financial statements and on the monthly borrowing base documents submitted to the bank in order to obtain the original and additional loans. He never did have the coin collection appraised so had no realistic opinion

as to its value. On a regular basis, he increased the value of the coin collection for reporting purposes, with no evidence that the collection had increased in value. He created mythical accounts receivable by including bids that he had submitted which did not represent contracts. .

6. The bank had no reason to question the legitimacy of the financial statement because the business operated by Mr. Rose actually did have significant gross revenues on an annual basis which the bank could determine by review of the monthly checking account statement.

7. The bank reasonably relied, to its detriment, on the debtor's intentionally and materially false representations of his financial condition and was left with a deficiency balance of more than $300,000.00 as a result.

8. Other than conjecture stated by Mr. Rose, there is no evidence supporting any of his counterclaim.

Accordingly, the bank has established each element of § 523(a)(2)(B). Mr. Rose and the trustee have not established any of their counterclaims. The debt of $385,106.49 plus interest accrued at the contract rate of 19% per annum from August 3, 2005, until entry of the judgment, and interest accruing at the federal judgment rate thereafter until paid, is excepted from discharge and judgment will be entered accordingly.

IT IS ORDERED that the debt owed to the bank by Mr. Rose is determined to be non-dischargeable under 11 U.S.C. § 523(a)(2)(B). None of the claims by Mr. Rose against the bank are substantiated and a judgment will be entered in favor of the bank and against Mr. Rose and the trustee on all such claims.

DATED:    June 11, 2012

BY THE COURT:

/s/ Timothy J. Mahoney
United States Bankruptcy Judge

Notice given by the Court to:
    Barbara Lohr Van Sant
    John D. Stalnaker
    *Joel M. Carney
    Craig A. Knickrehm
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.